## SENATO v. UNITED STATES (SENATO, Third-Party Defendant).

District Court, S. D. New York.

June 18, 1948.

Archer, Bosch & Engeler, of New York City (Louis L. Archer, of New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., of New York City (Harold J. Raby, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Benjamin Meyer, of New York City, for third-party defendant.

BYERS, District Judge.

The object of this action is to resolve the conflicting claims of Francesca Gandolfo Senato, the mother of Nick Senato, a deceased soldier, and Nettie Senato, his widow, to the proceeds of $10,000.00 of National Service Life Insurance. Nick was killed in action in the Pacific theater on April 29, 1945, and the question for decision is the perplexing one of whether he had effected a change of beneficiary from his mother to his wife. There are no contested issues of fact, but argument pro and con is addressed to the inferences to be drawn from the testimony which is free from contradiction.

Two policies are involved for $5,000.00 each, represented by certificates N-1914979 and N-13469563, dated May 1, 1942, and September 1, 1943, respectively; in each the plaintiff Francesca was the beneficiary named.

She was advised of her son's death about July 17, 1945, by the Veterans Administration, and duly filled out forms electing to receive monthly payments for life; in due course the payments were made for some four months, and were then stopped by reason of the claim asserted on behalf of Nettie Senato that she was the true beneficiary.

The Government instituted this cause in order to resolve the controversy thus presented. Possession of the certificates was that of the mother, one being sent to her by mail, and the other delivered to her by Nick.

The precise duration of his military service is not disclosed, but the date of the first certificate indicates that he served for better than three years. The testimony is meager concerning his make-up and characteristics, which is to be regretted, because the effort to ascertain his true intent in the matter in litigation would be measurably aided by a larger understanding of the kind of a man he was and how he would be expected to perform a task that he had undertaken to accomplish.

He was married in Manhattan on February 10, 1944, in the Municipal Building, while on leave from camp; he arrived on the 8th and called at the home of Nettie,

and successfully urged that the marriage take place as soon as possible. The blood tests were taken on the 9th and the wedding followed on the 10th as stated, and the following day Nick returned to Camp Pickett, Virginia, and his bride accompanied him to the railroad station here to see him off.

On March 2nd he wrote a letter to her of which the following is a copy:

"Thursday March 2nd, 1944:

"Hello my darling:

"Wrote you a letter last night but it wasn't so very long and I did promise to write again today. Things here are about the same don't know what the next move is going to be or when. *Forgot to mention in yesterdays letter about transfering* (sic) *the insurance policy over to you. Well I got that straightened out here.* There has been no change in the weather but at the present time its pretty cold with the wind blowing a mile a minute. You know dear I didnt realize how tired you were till you wrote and told me that you took a cab from Prospect Avenue. I think the next time I get a pass Im taking you home instead of you seeing me off. Well honey Im keeping my fingers crossed on going any place for a few months anyway. If its any place I wish it was home—our home. Say do you think it's time to go out and look around for household equipment. I dont know I just got a hunch that this year will be the last year for me in the Army and for all of us concerned. Maybe Im a little bit hasty, eh dear! Seriously though dear, what would you get if I did come home now for good. Do you still prefer twin beds? Or would it be better to get an anti snoring device. Ill leave it up to you. Honey I miss you something awful and cannot wait to be with you for better or for worse. Just like that guy said to us down in City Hall. Incidentally honey today is our third anniversary. Its been three weeks today that weve been married. Dreamt about you all night and when I got up this morning I felt pretty tired. After I finish this letter Im going to write home. *Let me know when you receive the money order and also if you get word about the dependency allotment.* Ill write again tomorrow and so until I hear from you take good care of yourself

and dont take any abuse from Dora. Best regards to Toots. Lots of love to you my darling wife.

"Your loving husband,

"Nick"

(Italics added.)

The words emphasized constituting the the third and fourth sentences are relied upon by the widow to indicate the purpose and intent of her husband in signing W. D., A. G. O. Form No. 41 (part of U. S. Ex.A) on February 18, 1944. That document is entitled: "Designation or Change in Address of Beneficiary".

There is no dispute touching the customary office of this paper which forms a part of Nick's Service Record, which is to designate the person named by the soldier as the one to receive the six months' pay award payable on his death from wounds or disease. 10 U.S.C.A. § 903.

That sum automatically goes to the widow if there be one; otherwise to a child or children; or if none, to a dependent relative.

The necessity for filling out that form in this case arose from Nick's marriage on February 10, 1944, because prior to that time it is to be assumed that his unmarried status was a matter of record, and thus the dependency of his mother would entitle her to receive the six months' pay if the occasion should arise.

Standing by itself, therefore, the document of February 18, 1944, would have no necessary bearing upon the question of a possible change in beneficiary named in the policies. However, it might be efficacious to accomplish that purpose if it appears that such was the clear intention of the insured: Shapiro v. United States, 2 Cir., 166 F.2d 240; Citron v. United States, D.C., 69 F.Supp. 830.

Perhaps the appearance of the word "beneficiary" on Form 41 is responsible for justifiable confusion on the part of any soldier making use of it. That term is commonly used in connection with a life insurance policy, and its appearance in the title to the statute providing for the allowance is doubtless responsible for its presence in heavy type at the top of Form 41. It might escape the understanding of one

not alert to technical niceties, that this Form was designed to accomplish only the purpose of a particular statute, rather than to effect a change of beneficiary in a life insurance policy.

In all the cases cited by counsel, the Courts have regarded the substance of the soldier's intent rather than its form of expression, and that effort will be repeated here.

Turning to the letter itself—and an inspection of the photostat version is recommended—it will be seen that Nick was a good penman; that he could express himself clearly and pointedly; that the welfare of his bride of 21 days was present in his mind not only on the subject of insurance, but as to her fatigue (she was and always had been a working girl); that he had visions of their home and its equipment; that he realized they had married "for better or for worse".

In other words, the entire composition reflects a certain organization of mental processes, and an understandable preoccupation with visions of what the future seemed to hold in store for this newly married couple.

The second underlined sentence reveals an understanding of Nick's financial responsibility toward his wife as to allotment of his Army pay.

In this connection, it should be stated that the marriage itself seems not to have been an ill-considered and hasty expedient entered into upon the spur of the moment. These young people had discussed marriage frequently during the five years of their acquaintance. Nettie says that during this interval he proposed more than once, and said that he wanted to marry her, but at a given time he was not in a financial position to do so. She says that they had been engaged to marry from the time that he went into the Army.

Her maiden name was Waldman, from which it will be seen that they were of different racial origins and religious affiliations, which perhaps would account for the civil ceremony. She testified that when he urged marriage she said she thought they ought to wait until the war should be over, but that counsel did not prevail.

Nothing in her testimony or demeanor as a witness would justify the inference that this marriage was entered into on her part for the sake of financial benefit to her. She told how Nick had arranged to purchase one or more War Bonds by deductions from his pay, and that the Bonds had come to her from him.

To this recital of what little the testimony reveals of the kind of man that Nick seems to have been, and his attitude toward his wife, there must be added the tribute of his mother, that he was steadily employed in different jobs, first a shoe plant, and then in a defense plant; in the latter he was earning $43.00 per week when he went into the Army; that he gave some of his money to her, and that he was a truthful man. She too was a fine type of woman and a convincing witness. She makes a home for her husband and two unmarried children; also there are three who are married.

What has been set forth is believed to be necessary in order to ascertain, if that be reasonably possible, what may be deemed to have been in Nick's mind when he wrote: "Forgot to mention in yesterdays letter about transferring the insurance policy over to you. Well I got that straightened out here."

There can be no doubt that he was talking about a transfer of insurance, and that could mean but one thing. So much for that sentence.

As to the ensuing words, the Government and the plaintiff suggest—perhaps the latter even argues—that this could have been an oblique expression intended "to placate" his wife, i.e., to mislead her to the extent of saying one thing and meaning another. To so conclude would be to impute to Nick a gift of duplicity, and a purpose to lie, for which I can find no support in the testimony, nor should such a judgment lightly be passed upon one whose record as a soldier and whose make-up as a man, seem to forbid the imputation of such a blemish to his character.

It is true that this letter is the only evidence of his intention to employ Form 41 to effect a change of beneficiary of insurance; also that he does not say: "I got that straightened out (the transfer) by using Form 41." If he had, probably there would

have been no litigation. Since it was possible to achieve his purpose by using that Form, it is not believed that interpolating the missing words does more than give completeness to the expressions that he did employ.

There is lacking such testimony as was present, of a witness to the signing of the special form, in Collins v. United States, 10 Cir., 161 F.2d 64; or of the precise request of the soldier, in Citron v. United States, supra; or of witnesses to whom the soldier confirmed his purpose in the use of Form 41, in Shapiro v. United States, supra.

These quoted words, however, comprise statements made by the man himself, and since the authenticity of the letter is not questioned, it would seem that he knew better than any one else could just what was in his own mind on the subject. In other words, this letter must either be accepted at face value, or be entirely ignored. No middle ground suggests itself to the Court.

It is thought that it must be accepted and deemed to constitute a sufficient discharge of that burden of proof which rests upon the widow, according to the holding of all the cases dealing with this subject.

Sight has not been lost of the testimony of Raymond L. Parsons (formerly Serg. Clapsaddle) who was company clerk in February of 1944 of the 306th Infantry, 3rd Battalion, at Camp Pickett. He said that sometimes the Veteran Administration Forms for change of beneficiary (life insurance) ran out; he remembered Nick Senato, but not his coming into the office. This is scarcely a cause for wonder.

Nor that of Elmer W. Leighton, who was warrant officer, Junior Grade, Asst. Regimental Adjutant attached to the same regiment. He said that in the month of February, 1944, the regiment received orders to prepare for overseas service, and that in March they moved to California, and on about the 26th sailed thence to Hawaii. As an incident to the preparations, all officers and privates were instructed to file Form 41 and the company clerks would check these as they came in, against the card records on file. That he himself signed from 6 to 12 of Form 336, the change of

beneficiary for insurance; and one of the triplicates was filed with the service record of the soldier to whom it applied. This total of 12 seems small in a regiment of about 3,000.

The testimony of these witnesses is thought to demonstrate that there was no precision or uniformity of practise concerning the method of changing the life insurance beneficiary, nor could there have been under prevailing conditions. That view is consistent with the testimony referred to in the Citron case, supra, 69 F.Supp. 830, at page 831.

There remains to deal with the suggestion that, since there are two policies here, the language used by Nick in referring to "the insurance policy" of necessity confines the Court to but one of the two in disposing of the case; and since neither is identified there is no basis for a choice.

It is true that he could have separately dealt with these policies, had he so chosen; his familiarity with the technique of the dependency allotment is an indication that he was not entirely uninstructed in matters concerning his family responsibilities in connection with his Army pay. It is a fair inference that, if he had intended to reserve one policy for his mother, he would have been candid enough to say so in writing to his wife on the subject; since he made no such distinction, he must have thought of his insurance as a single item, and intended the transfer to accomplish a single purpose, namely, to change the beneficiary of both policies from his mother to his wife.

The mother testified that she was not present at the marriage, but that Nick came home to say good-bye before leaving, and told her that he "would not touch" his insurance policy.

The widow said that, when they went to the train for his departure, Nick said he was going to change the policy, "change the beneficiary to you" (her), and would have a deduction from his pay to buy a war bond.

I doubt if either of these statements was admissible in the strict sense, but I allowed them to stand since there was no jury present to be swayed thereby emotionally.

540

I have disregarded both, having in mind the interested character of the testimony, the opportunity for misunderstanding, and other matters to which allusion is unnecessary.

The presence of further letters, written by Nick to his wife during the year which elapsed before his life was lost, might have been of assistance in the disposition of this case, which at best presents a narrow margin to support decision, but such are said to have been destroyed by Nettie's mother. If that is the fact, perhaps she thought she was doing her daughter a good turn.

Judgment for third party defendant, with a counsel fee of 10% to her attorney.

Findings are filed herewith.

In connection with the opinion of even date in this cause, the Court makes the following:

## Findings

1. Nick Senato, born April 4, 1913, was killed in action on April 29, 1945, while an infantry private in the United States Army in the Pacific Area.

2. On May 1, 1942, Certificate of Life Insurance N-1914979 in the sum of $5,000.00 under the National Service Life Insurance Act of 1940, 38 U.S.C.A. § 801 et seq., was issued to him, and the beneficiary therein named was his mother, Francesca Senato, the plaintiff in this case.

3. On September 1, 1943, a like Certificate (N-13469563) was issued to him in the sum of $5,000.00, the same beneficiary being named.

4. At the times above stated, the said Nick Senato was an unmarried man.

5. At the time of his death in action, both of said Certificates of Life Insurance were in the possession of the said Francesca Senato.

6. The said Francesca Senato was born January 30, 1889.

7. On February 10, 1944, the said Nick Senato duly and legally married Nettie Senato (nee Waldman) who was his wife at the time of his death.

8. The said Nettie Senato was born on December 1, 1913.

9. On or about February 18, 1944, and before March 2, 1944, the decedent, Nick Senato, entertained and effectuated the clear intent and purpose to change the beneficiary named in said two Certificates of Life Insurance from his mother, Francesca Senato, to his then wife, Nettie Senato.

10. For the purpose of carrying into effect his said intention, the deceased Nick Senato signed and delivered to the proper custodian thereof W.D., A.G.O. Form No. 41, on or about February 18, 1944, and thereby accomplished a change in beneficiary as to both of said polices, which is binding upon the United States of America as third party plaintiff in this action, and entitles the said Nettie Senato, the third party defendant, to all rights as beneficiary under said policies, as though she had originally been named therein as such.

11. The reasonable fees of the attorney for said Nettie Senato are hereby determined to be 10% of the amount of her recovery in this cause.

12. The monthly payments heretofore made under said policies by the United States of America to Francesca Senato are to be deducted from the amount to be recovered by the said Nettie Senato.

## Conclusion of Law

Judgment is awarded to the said Nettie Senato, the third party defendant in this cause, in accordance with the foregoing.